U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*[Signature: Harlin DeWayne Hale]*

**United States Bankruptcy Judge**

**Signed May 22, 2012**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § § § | |
| JAMES R. LEEUW and SHERI LEEUW, | § § § § | Case No. 11-32065 HDH-7 |
| Debtors. | § | |

| | | |
|---|---|---|
| PORTER TRIMBLE, ET AL., | § § | |
| Plaintiffs, | § § | Administratively Consolidated Under |
| v. | § § | Adversary No. 11-3405 |
| JAMES R. LEEUW, | § § § | |
| Defendant. | § | |

**MEMORANDUM OPINION**

This adversary proceeding concerns allegations of wrongdoing in the wine brokering business. The parties entered into a pre-trial order with stipulated and contested facts, which was entered by the Court. Pursuant to an "Order Granting Unopposed Motion to Consolidate Adversary

Proceedings," the Court held a joint trial on the complaints filed by Porter Trimble, Crymes G. Pittman, and Robert Chiraz ("Plaintiffs"). Upon conclusion of the presentation of evidence and testimony, the Court took the matter under advisement.

In their complaints, the Plaintiffs claim that either James R. Leeuw or James R. Leeuw and his wife, Sheri Leeuw, owe them claims excepted from discharge under Bankruptcy Code Sections 523(a)(2), 523(a)(4) and 523(a)(6).[1] This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334. This matter is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (I), and (O).

**Background Facts**

On March 30, 2011, the Defendants filed a voluntary Chapter 7 bankruptcy petition. Each Plaintiff timely filed a separate complaint to determine the dischargeability of debts owed to them. Once the Plaintiffs' "Unopposed Motion to Consolidate Adversary Proceedings" was granted, the parties entered into a joint pretrial order with stipulated facts that the Court adopts in addition to the facts stated in this opinion. The Plaintiffs' claims are all based on actions taken by James R. Leeuw on behalf of The Wine Broker, Inc. ("TWB"), which he wholly owned and operated. Sheri Leeuw never had ownership in TWB, nor did she participate in its management. Each Plaintiff purchased wine, wine futures, or both from TWB, and they each dealt primarily with James R. Leeuw (hereinafter "Defendant"). TWB offered its customers ultra-premium wines, as well as its own storage facilities for wines purchased. Although the details of the Plaintiffs claims are not identical,

---

[1] Each Plaintiff filed separate Complaints, under individual docket numbers, asserting at least one or more of these sections in his cause of action. Plaintiff Trimble, unlike Plaintiffs Pittman and Chiraz, names only James R. Leeuw as a Defendant.

**Memorandum Opinion** Page 2

they share a common theme, in that each Plaintiff paid substantial sums of money for wine not received.

### Trimble

Trimble, a collector of fine wines, made payments in excess of $600,000 to TWB within a ten month period, beginning in 2007. Initially, Trimble dealt with one of TWB's sales agents, but that changed by November 2007, when the Defendant became Trimble's exclusive point of contact and the named sales agent on his account. The switch took place sometime after Trimble met with the Defendant to discuss the possibility of purchasing private parties' pre-existing wine collections, through TWB. Throughout their relationship, the Defendant would provide Trimble with lists of wines available for purchase. When Trimble was interested in purchasing an available wine collection, then the Defendant and Trimble would negotiate until they reached an agreement on the price. The price agreed to was understood by Trimble to be an amount in excess of the price that TWB would pay its seller, and Trimble always paid TWB the agreed price. Trimble placed orders with TWB until August 2008, and he prepaid TWB for those orders. The total amount of payments made from Trimble to TWB was approximately $610,000. Until the Spring of 2009, Trimble believed his wine was being stored in TWB's facilities. Critical to Trimble's complaint, is the fact that the Defendant was not forthcoming when he made inquiries about the delivery of his wine. Trimble offered the following testimony of the Defendant's responses to inquiries concerning the delivery of his wine: 1) Because the temperature was too hot, it would be too risky to remove it from the climate-controlled storage facilities, and 2) it was in the California storage facility and shipment could not be made because the volume of wine was insufficient to support its shipping cost. Finally, in March 2009, after Trimble threatened the Defendant with litigation, the Defendant eventually admitted to

Trimble that not all of his wine purchases had been made.

Upon learning that the Defendant had taken his money but could not deliver his wine, Trimble brought suit in a district court where they reached an agreed judgment for $445,553.16. Thereafter, Trimble agreed to suspend execution of the judgment in exchange for the Defendant's promise to make periodic deliveries. Because the Defendant did not make good on his promise and filed bankruptcy, Trimble filed a complaint with this Court on June 30, 2011. The parties disagree as to the current amount owed under the Agreed Judgment.

**Pittman**

Pittman, an investor in fine wines, made payments in excess of $145,000 to TWB between March 2002 and July 2004. As early as 1998, the Defendant began soliciting the business of Pittman with respect to the purchases of Bordeaux wine futures.[2] By March 2002, Pittman agreed to purchase wine futures for the vintage year 2000, and the Defendant agreed to store the wine for once it had been delivered to TWB. That same month, Pittman, paid TWB the purchase price for this transaction, which was $36,844.14. During 2004, Pittman purchased more wine futures, for the vintage year 2003. Contemporaneously, Pittman paid TWB the purchase price of $108,976. Similar to the 2002 purchase, TWB agreed to store Pittman's wine in its facilities. Until Pittman received notice of the bankruptcy, he believed that TWB had purchased his wine and that it had been delivered to TWB, where it was being stored in a climate-controlled environment. To demonstrate that his

---

[2] As opposed to wine ready for consumption, purchasing "wine futures" means buying wine before it has matured and is bottled. In good vintages, "wine futures" can offer the investor the greatest return because the initial release prices are usually the lowest at which the wines will ever be sold.

**Memorandum Opinion**  Page 4

belief was justified and reasonable, Pittman presented evidence that the Defendant deceived him.[3]

**Chiraz**

Chiraz, an investor in fine wines, made payments in excess of $89,000 to TWB. Chiraz's first purchase was made sometime around mid-2004, and his last purchase was made on or about October 2006. Chiraz purchased wine ready for consumption and shipment, as well as wine futures. With both types of purchases, the agreement terms provided that Chiraz's wine purchases would be maintained and stored in TWB's temperature controlled storage facility. Therefore, Chiraz believed, mistakenly, that his wine purchases were being stored in TWB's facility. Based on such belief, Chiraz entered into transactions with third parties seeking to purchase his wine. According to the agreement terms between Chiraz and the third party buyers, the purchase price for these transactions was paid via credit card payments made to TWB. The Defendant charged nearly $95,000 to the credit cards of two third party buyers; however, the Defendant never delivered the wines purchased and paid for by the third parties. The unsatisfied third party buyers looked to their seller for redress, resulting in liability to Chiraz. He eventually repaid them by making their monthly credit card payments.

---

[3] On June 18, 2004, Defendant sent an email to Pittman, stating that he "already ha[d] 4 cases of Haut brion." Again, on July 6, 2009, Defendant sent another email confirming for Pittman that TWB was storing his inventory. It including the following language: "Here is your wine inventory" and "[l]et me know if you want to discuss selling some." However, it was undisputed at trial, that the majority of the items listed as inventory were not in TWB's storage facility at the time of the email because TWB had not yet purchased them.

**Analysis**

The burden is on the Plaintiffs to prove by a preponderance of the evidence that each of the elements under subsections 523(a)(2), 523(a)(4), and 523(a)(6) have been met. *See Grogan v. Garner,* 498 U.S. 279, 286-88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *see also In re Mercer,* 246 F.3d 391, 403 (5th Cir. 2001).

Bankruptcy Code Section 523(a)(2)(A) provides, in relevant part, that a debt will not be discharged in bankruptcy if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). Thus, for a debt to be nondischargeable under section 523(a)(2)(A), a creditor must show:

> (1) the debtor made a representation;
> (2) the debtor knew the representation was false;
> (3) the representation was made with the intent to deceive the creditor;
> (4) the creditor actually and justifiably relied on the representation; and
> (5) the creditor sustained a loss as a proximate result of its reliance.

*GE Capital Corp. v. Acosta (In re Acosta),* 406 F.3d 367, 372 (5th Cir. 2005) (citing *In re Mercer,* 246 F.3d 391, 403 (5th Cir. 2001)).

Bankruptcy Code Section 523(a)(4) provides, in relevant part, that a debt will not be discharged in bankruptcy if it is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). To show non-dischargeability under § 523(a)(4) for fraud or defalcation, a creditor must prove by a preponderance of the evidence that (1) the debt was caused by fraud or defalcation, and (2) there was a fiduciary relationship between the parties at the time the debt was created. *In re Chavez,* 140 B.R. 413, 422 (Bankr. W.D. Tex. 1992). In the

context of section 523(a)(4), fiduciary is defined much more narrowly than under general common law and "is limited to instances involving express or technical trusts." *Miller v. Abrams (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998). However, a fiduciary relationship is not necessary in order for debts arising out of embezzlement or larceny to be excepted from discharge under section 523(a)(4). *Graham v. Wood (In re Wood)*, 2007 WL 2154239 (Bankr. N.D. Tex. July 25, 2007) (citing *In re Adams*, 348 B.R. 368, 373 (Bankr. E.D. La. 2005)). Larceny, under federal common law, is defined as the "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *In re Barrett*, 156 B.R. 529, 533 n. 3 (Bankr. N.D. Tex. 1993). Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Miller*, 156 F.3d at 602. To prove embezzlement, the creditor must prove the entrustment of "his property to the debtor, that the debtor appropriated the property for use other than that for which it was entrusted, and that there was intent to defraud on the part of the debtor." *Id*. at 603. It is possible to wrongfully appropriate property without the intent to defraud, so wrongful appropriation by a debtor who is merely "acting under an erroneous belief of entitlement" does not constitute embezzlement for purposes of section 523(a)(4). *Id.*

Bankruptcy Code Section 523(a)(6) provides, in relevant part, that a debt will not be discharged "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In order for this subsection to apply, the debtor must act with "either an objective substantial certainty of harm or a subjective motive to cause harm." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (quoting *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998)). Injuries caused by negligent or reckless

behavior are insufficient to meet the requirements of section 523(a)(6); they must be the result of willfulness. *Kawaauhau v. Geiger,* 523 U.S. 57, 64, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *see also Raspanti v. Keaty (In re Keaty),* 397 F.3d 264, 269-70 (5th Cir. 2005).

**Plaintiff Trimble's Claims**

Trimble asserts that the agreed judgment debt of $445,553.16 reflects the amount of money that the Defendant obtained by "false pretenses, a false representation, or actual fraud." Therefore, Trimble claims that the debt is not dischargeable under section 523(a)(2)(A). In addition, Trimble seeks a judgment for the recovery of post-judgment interest[4] and attorney's fees.[5] He also asserts that the post-judgment interest and attorney's fees constitute debts that are not dischargeable under section 523(a)(2)(A).

The Court finds that Trimble has met his burden of proof and that the debts are not dischargeable. The debtor, Defendant, represented to Trimble that his wine orders would be purchased and stored in exchange for the payment of the purchase price. At no time prior to Trimble's threats of litigation, did the Defendant inform Trimble that his wine had not been purchased by or delivered to TWB. Based on the terms of their agreement, Trimble upheld his part of the bargain and made payments of approximately $610,000 to TWB. Therefore, Trimble justifiably believed that the wine he ordered and paid for was being held for him in TWB's storage facility. The

---

[4] The parties agreed judgment provides for the recovery of post-judgment interest, and Trimble seeks interest for the time period up to and after issuance of this Court's judgment in this adversary proceeding.

[5] Trimble seeks attorney's fees and expenses in connection with preserving his rights and interests in the Debtor's bankruptcy case, as well as this adversary proceeding; however, this issue will be taken up along with the other Plaintiffs' claims for attorney's fees in a post-judgment hearing.

Defendant testified that he intended, at all times, to purchase the wine and store it. However, the court finds that the evidence shows that the Defendant took Trimble's money, and orders, hoping to get lucky and find the wines at a discounted rate sometime in the future. Because the Defendant wanted to maximize profits, he chose not to buy the wine when Trimble ordered and paid for it, despite its availability at prices known to him during their negotiations. In other words, the Defendant's plan was to gamble on the possibility that he would eventually find the wine at a steal, even though that required risking discovery if Trimble wanted to have his wine shipped from TWB. In fact, when Trimble asked about the delivery of wine, the Defendant fabricated excuses as to why the wine had not or could not be delivered.

Thus, the Court finds that the Defendant knew his representations were false and that they were meant to deceive Trimble. Surely Trimble would not have made payments of such substantial amounts if he had known what the Defendant actually intended to do, so he actually and justifiably relied on Trimble's misrepresentations. Trimble clearly sustained a loss as a proximate result of the Defendant's misrepresentation.

The U.S. Supreme Court, in *Cohen v. De La Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), held that the discharge exception for actual fraud, pursuant to section 523(a)(2), prevents discharge of all liability arising from the debtor's fraud, including punitive damages and an award for attorney's fees and costs, awarded under state law. Trimble's agreed judgment debt of $445,553.16, as well as post-judgment interest and any attorney's fees awarded are therefore non-dischargeable.

**Plaintiff Pittman's Claims**

Pittman asserts that the debts owed to him are not dischargeable under sections 523(a)(2) and 523(a)(4). Pittman claims that the Defendants obtained his money through false pretenses, false representations, actual fraud, and or deceit; therefore, the debts owed to Pittman should be excepted from discharge pursuant to section 523(a)(2). Additionally, Pittman claims that the Defendant's actions amounted to theft or embezzlement of his money and or his wine. Accordingly, Pittman asserts that the debts are not dischargeable under section 523(a)(4).

The Court finds that Pittman has met his burden of proof and that the debts objected to are not dischargeable, pursuant to section 523(a)(2). Therefore, it is not necessary to reach Pittman's claim that the debts should be excepted from discharge under section 523(a)(4). Pittman made payments to TWB based on misrepresentations made by the Defendant. Specifically, the Defendant represented to Pittman that he would acquire and store wines for Pittman in exchange for Pittman's money. Pittman, like Trimble, made the payments in accordance with their agreement. However, the Defendant did not buy, much less store, Pittman's wine. According to Pittman's testimony, he was unaware that his wine had not been purchased or delivered to TWB until he received notice of the Debtor's bankruptcy action.

The Court finds the emails that the Defendant sent to Pittman, especially egregious because the language used was deceptively misleading, at best, and blatantly dishonest, at worst. The evidence tends to show that the Defendant knowingly made false representations regarding his intentions to purchase and store Pittman's wine. It may be true that the Defendant hoped to find Pittman's wine for cheaper at some unknown future date; however the mere hope to get lucky enough

to fill Pittman's orders in this manner is insufficient. Pittman justifiably and actually relied on the misrepresentations with each order placed and each payment remitted. Initially, The Defendant was unwilling to reveal his true intentions because that would have put an end to their negotiations. Later the Defendant was unwilling to disclose the fact that he had not purchased Pittman's wine, even if that required providing Pittman with inventory lists that included wines not yet in TWB's storage facility because the Defendant had not yet purchased them for Pittman. Because payments were made based on the Defendant's intentional misrepresentations, and no wine was delivered, it is clear to the Court that Pittman sustained a loss as a proximate result of the Defendant's misrepresentation.

Texas recognizes both out-of-pocket and benefit-of-the-bargain damages for common-law fraud. *See Baylor University v. Sonnichsen,* 221 S.W.3d 632, 636 (Tex. 2007); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49–50 (Tex.1998). Pittman suffered damages in the amount of $272,390.00 for the value of the wines that were paid for, but never purchased, as stipulated in the parties pretrial order, as well as an additional $2,562.00 an additional six bottles of 2000 Talbot and an additional two bottles of 2000 La Mission Haut Brion that were reflected on the invoices paid by Mr. Pittman.

**Plaintiff Chiraz's Claims**

Chiraz asserts that the debts owed to him by the Defendant are not dischargeable, under any of the following sections: 523(a)(2), 523(a)(4) and 523(a)(6). In general, Chiraz claims that the Defendant operated TWB in a misleading and dishonest manner. Specifically, Chiraz claims that the Defendant's actions with respect to his wine purchases, including wine futures, constituted the obtainment of money by false pretenses, false representations, actual fraud, and or deceit. Therefore, Chiraz asserts that the debts arising from these transactions are not dischargeable under section 523(a)(2). Chiraz also points to section 523(a)(4) in support of his objection to the discharge of the debts owed to him. He claims that the Defendant's actions amounted to theft or embezzlement of his money, wine, or both. Therefore, he asserts that the debts are not dischargeable under section 523(a)(4). Finally, Chiraz claims that the debts are not dischargeable under section 523(a)(6) because the debts arose through willful and malicious injury by the debtor, Defendant, to another entity, Chiraz. He asserts that the Defendant knew that taking Chiraz's money without buying the wine was substantially certain to cause harm to Chiraz, and that the Defendant knew he was essentially running a Ponzi scheme by taking money from new orders to pay for older orders. Therefore, Chiraz argues that the Defendant acted with either an objective substantial certainty of harm or a subjective motive to cause harm.

The Court finds that Chiraz met his burden of proof, and the debts owed to him are not dischargeable, pursuant to section 523(a)(2). Although the Court might reach the same decision under an application of section 523(a)(6), it is not necessary to analyze Chiraz's claim on grounds other than section 523(a)(2). The Defendant made the same representations to Chiraz that he made

to Pittman and to Trimble, which was that he would buy the wine Chiraz ordered and store it in TWB's facilities. Based on their agreement, Chiraz made payments to TWB and entered into transactions with third party buyers. The fact that he made payments and sold wine to third parties is evidence that he actually relied on the misrepresentations made by the Defendant. Furthermore, the Court finds that his reliance was justified. Chiraz had no reason to suspect that his wine orders had not been filled. As with Trimble and Pittman, the Defendant knowingly made the false representation concerning his intent to buy and store Chiraz's wine because he intended to deceive Chiraz. As a result, Chiraz had to make good on the Defendant's deception to the third party buyers because the wine was not delivered. He repaid them and stood in their shoes for the credit card portion of his claims. Therefore, Chiraz sustained a loss in the amount of $238,946.94, as a proximate result of his reliance on the Defendant's misrepresentations.

**Innocent Spouse and Community Property Discharge**

Chiraz and Pittman both object to the discharge of the Defendant's wife, Sheri Leeuw. Essentially, they claim that she benefitted from funds being transferred from TWB's bank account to their personal accounts. Nevertheless, they do not allege in their complaints that she had any knowledge of or involvement in the Defendant's misconduct. In *In re Allison*, the Fifth Circuit "established that, in the case of husband-and-wife debtors, the marital relationship alone is not enough to impute one spouse's fraud to the other for nondischargeability purposes." *See Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 Fed. Appx. 943 (5th Cir. La. 2009) *(citing Allison v. Roberts (In re Allison)*, 960 F. 2d. 481, 485-86 (5th Cir. 1992)). Because Sheri Leeuw did not participate in the management or operation of TWB, much less the misrepresentations forming the basis of the

Plaintiffs' complaints, the debts owed to Plaintiffs are dischargeable as to her.

Two provisions of the Bankruptcy Code are applicable when two spouses file for bankruptcy but only one of them receives a discharge of a particular debt. In general, when a debtor spouse receives a discharge of the other spouse's debt, then the first spouse's discharge prevents creditors from reaching after-acquired community property to satisfy the debt. Section 524(a)(3) of the Bankruptcy Code provides:

> A discharge in a case under this title operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim . . . .

11 U.S.C. § 524(a)(3). On the other hand, section 524(b) of the Bankruptcy Code provides an exception to this general rule, stating that section 524(a)(3) does not apply if:

> (1)(A) the debtor's spouse is a debtor in a case under this title, or a bankrupt or a debtor in a case under the Bankruptcy Act, commenced within six years of the date of the filing of the petition in the case concerning the debtor; and
>
> (B) the court does not grant the debtor's spouse a discharge in such case concerning the debtor's spouse . . . .

11 U.S.C. § 524(b). Therefore, one debtor spouse's discharge does not prevent creditors from proceeding against after-acquired community property where the other spouse has been denied a discharge of the same debt. Stated differently, if a debt is excepted from discharge because of one spouse's misconduct, then the protection of after-acquired community property does not apply to either spouses' interest in the same. These subsections work together to prevent wrongdoers from

"hiding behind" their innocent spouse's discharge. *See* 4 COLLIER ON BANKRUPTCY, ¶ 524.02[3] (Lawrence P. King ed., 16th ed. 2012).

Applying these subsections and the principles on which they are based, it is clear that the community debt is not dischargeable. According to section 524(b), the general rule in section 524(a)(3) does not apply because the debts are excepted from discharge under section 523(a)(2). The protection granted to after-acquired community property is granted only where both spouses are innocent and the Defendant, James R. Leeuw, was not innocent; therefore, a discharge as to the debtors' after-acquired community property must be denied.

**Conclusion**

For the reasons stated above, discharge of the debts owed to Plaintiffs is denied so that the Defendant, James R. Leeuw, remains liable for such debts. Therefore, the Plaintiffs may proceed against his separate property, as well as the debtors' after-acquired community property.

Counsel for Plaintiffs shall file any requests for attorney's fees within 14 days form the date of entry of this opinion. Counsel for Defendants shall respond within 14 days, and the Court will rule on the pleadings. Thereafter, counsel for Plaintiffs will submit proposed judgments.

###End of Memorandum Opinion###